IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LAZARUS ORTEGA, | ) | 2: 08-CV-00588 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTION FOR |
| vs. | ) | SUMMARY JUDGMENT |
| | ) | |
| CSP-SACRAMENTO PRISON | ) | |
| OFFICIALS HUTCHINGS AND | ) | |
| WILLIAMSON, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER DENYING MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION.

Plaintiff Lazarus Ortega is a prisoner proceeding pro se.  On June 6, 2008, Ortega filed the First Amended Complaint in this matter, asserting that various prison officials had violated his Eighth Amendment right to be free from cruel and unusual punishment.  Ortega asserts that Defendants failed to respond to his multiple requests to be assigned to a different cell because Ortega considered his cellmate to be dangerous.  Ortega seeks to hold Defendants liable under 42 U.S.C. § 1983 for the assault that he subsequently suffered at the hands of his cellmate.

On February 22, 2011, Ortega stipulated to the dismissal with prejudice of Defendants Reyes and Walker.  See ECF No. 50.  At a telephone hearing on July 25, 2011, Ortega dismissed with prejudice Defendants Costa and Deason.  At that same hearing, the court clarified with Ortega that he is only

proceeding with claims against Defendants Hutchings and Williamson.

At the July 25, 2011, telephone hearing, the court discussed the scheduling of the present motion, telling Ortega that any written opposition to the motion for summary judgment was due on August 9, 2011, but that Ortega could oppose the motion orally if he was unable to submit a timely opposition.  No written opposition has been filed.

II.     STANDARD.

Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56©.  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102

(9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.  "A fact is material if it could affect the outcome of the suit under the governing substantive law."  Miller, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  Nissan Fire, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  Miller, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial."  Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "A genuine

dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." California v. Campbell, 319 F.3d 1161, 1166 (9th Cir. 2003); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." Miller, 454 F.3d at 988 (quotations and brackets omitted).

III.     BACKGROUND FACTS.

   A.   Allegations in First Amended Complaint.

In relevant part, the First Amended Complaint alleges that California Department of Corrections and Rehabilitation ("CDCR") officials Hutchings and Williamson were deliberately indifferent to Ortega's safety when they failed to respond to Ortega's multiple requests to change cells, which Ortega says flowed from his cellmate's threats to harm and/or kill him. See (Verified) First Amended Complaint, Preliminary Statement, ECF No. 7.

Ortega says that, on or about November 8, 2006, he asked CDCR correctional officer Hutchings to move him to a new cell because his cellmate had threatened him. According to Ortega, Hutchings responded that there were no vacant cells that Ortega could be moved to. Ortega alleges that he informed

Hutchings that cell #232 was vacant, but that Hutchings responded that cell #232 was out of order because of a plumbing problem. Ortega says he was willing to move into the cell with the plumbing problem "just to get away from the imminent threat made by Williams." See (Verified) First Amended Complaint ¶ 15. Hutchings allegedly then told Ortega that a cell change was not going to happen and that Ortega would just have to wait for a cell to open up. See id. ¶¶ 14-16. Hutchings is named as a Defendant in his individual capacity. Id. ¶ 4.

Ortega alleges that the following day, November 9, 2006, he once again asked Hutchings for a cell change out of concern for his safety. Ortega alleges that Hutchings refused to act. See (Verified) First Amended Complaint ¶ 18.

Ortega alleges that, a little later that day, he orally complained to Deason and Hutchings's supervisor, CDCR Lieutenant Williamson, that safety concerns made a cell change imperative telling Williamson that "he was in fear for his safety and his life." See (Verified) First Amended Complaint ¶ 20. Ortega says that he told Williamson that he had tried to get Hutchings and others to move his cell, but that none of them had acted. Ortega alleges that Williamson also did nothing. See id. ¶¶ 19-21. Williamson is named as a Defendant in his individual capacity. Id. ¶ 6.

According to Ortega, when he returned to his cell that day, his cellmate "slammed" a 13-inch television set into his

5

head, knocking him unconscious. <u>See</u> (Verified) First Amended Complaint ¶ 23. Ortega says that he was taken to the emergency room at the University of California Davis Hospital and was treated for severe head, neck, spine, and nerve damage, as well as breathing problems. <u>Id.</u> ¶ 24.

        B.    <u>Facts Submitted With the Motion.</u>

Attached to the motion were Ortega's deposition transcript and declarations by both Hutchings and Williamson.

Notwithstanding the allegation in the First Amended Complaint concerning an "imminent threat made by Williamson," <u>see</u> (Verified) First Amended Complaint ¶ 15, Ortega testified in his deposition that, before the assault, his cellmate, Williams, had not expressly threatened him. Ortega said that they "were just not getting along, and the vibe was really bad and it was high tense." <u>See</u> Deposition of Lazarus Ortega at 17, Feb. 18, 2011, ECF No. 65-4. Taking into account Ortega's status as a <u>pro se</u> party, the court does not construe Ortega's deposition testimony as an attempt to retract the prior verified statement in his pleading. The reference in the First Amended Complaint to an "imminent threat" may have been intended to suggest that the making of a threat appeared imminent (even if no threat had actually been made), not that a threat of imminent harm had been voiced. In any event, the deposition testimony is more favorable to Defendants than a reading of the First Amended Complaint as

6

suggesting that an actual threat was made before the attack occurred.

        Ortega testified that, on November 8, 2006, he asked Hutchings to move his cell, telling Hutchings that Ortega and Williams "were having serious discrepancies and, you know, I didn't feel safe and I wanted to move up out of the cell ASAP." Id. at 15, 20.  Ortega testified that he did not tell Hutchings that Williams had threatened him, only that he "didn't feel safe with him."  Id. at 21.  Ortega testified that Hutchings told him that he was not going to be able to move his cell.  Id. at 22.

        In his deposition, Ortega testified that the following day he asked Hutchings to move him into an open cell that Ortega knew about, noting that his arguments with Williams "were increasingly getting frequent and we really needed to be moved immediately before it escalated into a physical altercation." Id. at 31.  Ortega says that Hutchings told him that Hutchings knew of the open cell, but that it had some sort of plumbing problem that made a move impracticable.  Id. at 32-33.

        Hutchings confirms that, on November 9, 2006, Ortega asked to move to Cell 232, an open cell.  See Declaration of Officer R. Hutchings ¶ 2, June 13, 2011, ECF No. 65-6.  Hutchings says that he told Ortega that that cell was unavailable because it needed plumbing repairs.  Id.  Hutchings says that he told Ortega to look at the "Picture Board" to see if there were any other inmates Ortega wanted to room with.  Hutchings says that

Ortega looked at the "Picture Board" and then told Hutchings that Ortega did not see anyone he wanted to room with and that he "chose to stay with his current cellmate, Williams." Id. ¶ 3. Hutchings denies having been told by Ortega that Ortega and Williams were not getting along or that Ortega feared Williams. Id. ¶ 5.  Hutchings says that the first he knew of any problem between Ortega and Williams was when Hutchings was told that they were actually fighting. Id. ¶ 7.  Hutchings says that, when inmates tell him that they feel threatened or believe that their safety is in danger, prison policy dictates that he "separate the cell mates, place them in handcuffs and/or immediately place them into a holding cell[] for further investigations into the matter." Id. ¶ 6.

Ortega testified at his deposition that, after he talked with Hutchings, he talked with Williamson in the "B facility yard." Id. at 33.  Ortega says that he told Williamson that his request to move his cell was being denied and that he needed to move out of his cell because he and Williams were incompatible and were "getting into some very serious arguments." Id. at 34.  Ortega says that he told Williamson that he thought "it was going to get physical if we weren't moved." Id.  Ortega says that Williamson told him that Williamson could not do anything about it because Williamson was assigned to another "block." Id. at 35-36.

8

Williamson says he does not remember talking with Ortega about a cell move in November 2006. See Declaration of Lt. M. Williamson ¶ 3, June 14, 2011, ECF No. 66. Williamson denies having been told by Ortega that Ortega had any concern for his safety or had felt threatened in any way. Id. ¶ 3. Like Hutchings, Williamson says that, when an inmate tells him about feeling threatened by another inmate, it is his practice to separate the inmates until further information is gathered. Id. ¶ 5.

Later on November 9, 2006, Ortega was allegedly in his cell, but remembers nothing else until he woke up at the hospital. See Ortega Depo. at 38. Ortega says that he was told that Williams had hit him over the head with a 13-inch television that had been in their cell. Id. at 40.

IV.     ANALYSIS.

     A.  There Are Questions of Fact As To Whether Hutchings And Williamson Were Deliberately Indifferent to Ortega's Safety.

Ortega's § 1983 claims against Hutchings and Williamson implicate the Eighth Amendment, which requires that prison officials take reasonable steps to ensure the safety of inmates. See Farmer v. Brennan, 511 U.S. 825, 833 (1994). Specifically, prison officials have a duty to protect inmates from violence at the hands of other inmates. Id. However, not every injury suffered by one prisoner at the hands of another "translates into

9

constitutional liability for prison officials responsible for the victim's safety." Id. at 834.

A prison official violates the Eighth Amendment only when two requirements are met:

> First, the deprivation alleged must be, objectively, "sufficiently serious"; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities . . . ." For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety.

Id. (citations and footnote omitted).

The Supreme Court noted in Farmer:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Id. at 837. This standard does not require the official to "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the

other hand, he must have more than a mere suspicion that an attack will occur." Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).

> As the Ninth Circuit has said:
>
> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the stabbing incident, but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. Especially when, as in this case, a prisoner seeks to hold a prison employee individually liable because another prisoner attacked him, the prisoner must establish individual fault.

Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir. 1988) (citations omitted). In other words, to violate the Eighth Amendment, a deprivation must be sufficiently serious from an objective viewpoint, and the prison official must have a sufficiently culpable state of mind from a subjective viewpoint. Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1049 (9th Cir. 2002).

On June 13, 2011, Hutchings and Williamson filed a motion for summary judgment, claiming that they had not violated Ortega's Eighth Amendment rights and that, as a result, they had qualified immunity with respect to Ortega's claims. Even though Ortega filed no written opposition, questions of fact preclude

11

the motion for summary judgment.  In other words, Hutchings and Williamson fail to meet their initial burden of demonstrating that they are entitled to judgment as a matter of law, and Ortega accordingly has no obligation to produce anything.  See Nissan Fire, 210 F.3d at 1102-03 ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.").

When the evidence is viewed in the light most favorable to Ortega, there is a dispute as to whether Hutchings and Williamson were deliberately indifferent to a substantial risk of serious harm to Ortega.  Ortega allegedly told Hutchings on November 8, 2006, that Ortega and his cellmate "were having serious discrepancies," that Ortega did not feel safe, and that Ortega wanted to move as soon as possible.  See Ortega Depo. at 15, 20, 22.  The following day, Ortega again allegedly told Hutchings that Ortega needed to move cells because his arguments with Williams were becoming more frequent.  Ortega says he told Hutchings that he needed to be moved before those arguments "escalated into a physical altercation."  Id. at 31.  Although Hutchings denies having had these conversations, the court must assume the conversations took place for purposes of the present motion for summary judgment.  See Miller, 454 F.3d at 988.  Ortega's deposition testimony raises a question of fact as to

whether Hutchings was deliberately indifferent to a substantial risk to Ortega's safety.  For purposes of this motion, it is immaterial whether Lonzell Green, another inmate, corroborates the facts presented by Hutchings and Williamson.  Ortega's deposition testimony is sufficient to create a genuine issue of fact that precludes summary judgment.

        Citing Berg, 794 F.2d at 459, Hutchings argues for summary judgment, saying that, even assuming the alleged conversations he supposedly had with Ortega were as described by Ortega, he would not have had "more than a mere suspicion that an attack [would] occur."  Whether Hutchings had "more than a mere suspicion" that Williams would attack Ortega is a factual issue for the jury to decide.  Although Ortega is not now claiming that he told Hutchings that he had been actually threatened by Williams, he does contend that he told him that he did not feel safe with Williams as his cellmate, that they were increasingly getting into arguments, and that he needed to be moved before the arguments escalated into a physical altercation.  Because Hutchings denies having been told of safety concerns by Ortega, this is not a case involving Hutchings's belief as to the likelihood of such an attack or a case in which a prison official is constrained by outside influences, concerns about safety of other inmates, or the nature of prison life.  See Berg, 794 F.3d at 462. Hutchings says that, had Ortega told him he had safety

13

concerns, Hutchings would have followed prison policy and separated Ortega and Williams. This causes this court to conclude that the question of whether Hutchings was deliberately indifferent to the risks Ortega faced turns on what, if anything, Hutchings had reason to be concerned about.

A similar question of fact precludes summary judgment with respect to Williamson. Although Williamson denies having had a conversation with Ortega about moving cells, Ortega says that he told Williamson that Ortega and Williams were "getting into some very serious arguments" and that he thought "it was going to get physical if we weren't moved." Id. at 33. As with Hutchings, this, together with what Williamson says was a policy of promptly separating cellmates where safety concerns were raised, is sufficient to raise a genuine issue of fact as to whether Williamson was deliberately indifferent to a substantial risk to Ortega's safety.

        B.    Questions of Fact Preclude Summary Judgment Based on Qualified Immunity.

Hutchings and Williamson contend they have qualified immunity with respect to Ortega's § 1983 claim. "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Saucier v. Katz, 533 U.S. 194, 200 (2001) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). The goal of qualified immunity is to "avoid excessive disruption of government and permit the resolution of many insubstantial

14

claims on summary judgment." Saucier, 533 U.S. at 202 (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow, 457 U.S. at 818). Qualified immunity protects government officials from their exercise of poor judgment, and fails to protect only those who are "plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Because the entitlement is an immunity from suit, the court should determine "at the earliest possible stage in litigation" whether a defendant has qualified immunity. Hunter v. Bryant, 502 U.S. 224, 227 (1991).

The court's qualified immunity analysis has two prongs. In one prong, the court examines whether the facts alleged, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. Saucier, 533 U.S. at 201. If no constitutional right would have been violated were the allegations established, the court need not inquire further and the official has qualified immunity. In the other prong, the court evaluates whether the right was clearly established. Id. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it

15

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). Qualified immunity is appropriate "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful." Saucier, 533 U.S. at 202. Courts have discretion to decide which of the two prongs of the qualified immunity test to examine first. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

     The Ninth Circuit, noting that Saucier undermined prior Ninth Circuit law, now directs district courts to determine whether qualified immunity was available, not to conclude that a question of fact as to deliberate indifference requires a denial of qualified immunity. See Estate of Ford, 301 F.3d at 1048-50. Even if there are questions of fact as to whether a prison official was deliberately indifferent, a court may determine that qualified immunity is available because the alleged constitutional violation was not clearly established. Id. The Ninth Circuit reasons that, because qualified immunity acknowledges that reasonable mistakes can be made and protects "all but the plainly incompetent or those who knowingly violate the law," prison officials may be qualifiedly immune even if they mistakenly, but reasonably, perceive the risk of serious harm to be low. Id. Courts must examine whether it would have been clear to a reasonable prison official that he or she would have

16

violated the law by disregarding a substantial risk of serious harm where the official inferred that risk from the facts he had. Id. at 1050.

Both Hutchings and Williamson say that, had they known of an inmate's safety concerns, they would have separated the inmates until further information could be gathered. Although both Hutchings and Williamson deny having been told by Ortega that he had safety concerns arising out of being housed with Williams, the court must assume for purposes of this motion that such conversations took place. Given Hutchings and Williamson's implied statements that they would have separated Ortega and Williams had they known of Ortega's safety concerns, questions of fact exist as to whether a reasonable prison official knowing what Hutchings and Williamson allegedly knew would have inferred that there was a substantial risk of serious harm to Ortega if Hutchings and/or Williamson ignored Ortega's concerns. Accordingly, Hutchings and Williamson fail to show an entitlement to qualified immunity on the present motion.

V.      CONCLUSION.

For the foregoing reasons, the court denies the motion for summary judgment.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 25, 2011.



    /s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge

Lawrence Ortega v. CSP-Sacramento Prison Officials Hutchings and Williamson; Civil No. 2: 08-00588 SOM; Order Denying Motion for Summary Judgment

18